UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTWOINE HILL and<br>CLYDE JACKSON,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF CHICAGO,<br>ROGER MURPHY,<br>and THOMAS CARR,<br><br>    Defendants. | No. 15 C 1317<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Antwoine Hill and Clyde Jackson allege that they were deprived of certain rights secured by the U.S. Constitution and 42 U.S.C. § 1983. They allege that Defendant Chicago Police Detectives, Roger Murphy and Thomas Carr, falsely arrested them, conducted an unlawful search, conspired to violate their constitutional rights, violated their right to due process under the law, and maliciously prosecuted them. They allege that the City of Chicago is also liable for these constitutional deprivations. In their Second Amended Complaint, the Plaintiffs also allege that the City of Chicago is liable for maintaining a policy of permitting police misconduct. Before me is Defendants' Motion for Summary Judgment, filed pursuant to Fed. R. Civ. P. 56. For the following reasons, Defendants' motion is granted on all counts except the policy claim against the City of Chicago.

### BACKGROUND

This case arises out of a murder, the Chicago Police Department's investigation of that murder, and the subsequent trial of the accused.

## I. New Year's Day Shooting and Initial Investigation

On January 1, 2013, Kelvin Jemison was fatally shot outside a Chicago Housing Authority Apartment Complex in Chicago. At the time of the shooting, Jemison was accompanied by his friend Dwayne Rolle.

Two Chicago homicide detectives for the Chicago Police Department, Detectives Roger Murphy and Thomas Carr ("the detectives") were assigned to the case and arrived at the murder scene late in the afternoon the day of the shooting. They contacted CHA video analyst Jon Hall to obtain access to the security camera footage of the shooting incident and asked to see all footage related to the event. Two different security videos showed a man with a handgun chasing Jemison and Rolle and firing at Jemison and Rolle. The videos showed the shooter running back towards a parked car after firing the handgun. A third video showed a dark sedan driving away from the area of the parked car. None of the video footage showed a lookout standing next to the shooter's vehicle.

The detectives spoke to the uniformed officers on location and interviewed several witnesses. Two witnesses, Miranda and Franshaun Delaney, provided the detectives with the names of three suspects.

Among those suspects named by Miranda and Franshaun Delaney are the two plaintiffs in this case, Clyde Jackson and Antwoine Hill. The third suspect identified by the witnesses, Anthony Robinson, was eventually found guilty of murdering Jemison. The detectives obtained photographs of all three suspects and used the photos to create three photo arrays. One witness, Tikiea Poe, identified Anthony Robinson as the driver of a vehicle around the apartment complex prior to the shooting.

Franshaun Delaney told detectives that Jemison had slept over at her home the night prior

2

to the shooting with his friend Dwayne Rolle. Delaney also told the detectives that after she heard the gunshots, she saw Rolle running away from the gunshots towards her apartment. When Rolle reached the apartment, he told Delaney that that "B-A" and "Twan" were the offenders. "B-A" is Anthony Robinson's nickname and "Twan" is Plaintiff Antwoine Hill's nickname. Delaney also testified that she knew Jemison was having issues with a rival gang and that Robinson and Hill were members of that gang.

Franshaun's mother, Miranda Delaney, confirmed that Rolle ran back to the house after the shooting, and she recalled Rolle saying that Robinson, Hill and Plaintiff Clyde Jackson were responsible for the shooting.

## II. Dwayne Rolle's Participation in the Investigation

Based on the testimony of these witnesses, the detectives sought out Rolle for questioning. The detectives brought Rolle to the Area Central police headquarters on January 8, 2013 to ask him about the shooting. At the time of questioning, Rolle was 17 years old and had an active juvenile warrant for his arrest. The detectives did not arrest Rolle, and Rolle confirmed that he was free to leave throughout this questioning. The police had Rolle view the three photo arrays and sign a form acknowledging that the suspect may not be in the photo spread, that he was not required to identify anybody, and that he need not assume the person administering the form knows which person is a suspect. Rolle then marked an X over the photographs of Robinson, Hill, and Jackson on three photo arrays.

What Rolle meant by marking these three photos with an X is now the subject of dispute. During subsequent questioning by Cook County Assistant State's Attorney Marina Parra, Rolle acknowledged that he marked an X over the photos of people he thought were involved in the January 1 shooting. But when the case was brought to trial, Rolle testified that he was marking

an X over people he knew, regardless of their involvement in the crime. Even with this contradicting testimony, it is undisputed that at the time Rolle marked the photos with an X, he had just signed the photo array acknowledgment which specifically mentions that the photos might involve "suspects." Rolle did not communicate any confusion about the meaning of his markings to the police at the time he made the marks.

Following the photo identifications, an Assistant State's Attorney interviewed Rolle. During this interview, Rolle confirmed his identifications of the three suspects.

On February 12, 2013, the detectives sought and obtained felony charges for first degree murder against Clyde Jackson. Following the arrest, the detectives picked up Rolle, had him sign the lineup advisory form again, and he identified Jackson in a lineup. Again, the parties dispute the precise meaning of this identification, whether Rolle was identifying Jackson as a suspect in the January 1 shooting or just pointing out that he knew Jackson. On February 14, 2013, Rolle again filled out a spread advisory form and identified Robinson in a line-up as the individual who shot his friend Jemison.

Also on February 14, Rolle sat down for questioning with Cook County ASA Parra. In this videotaped interview, with the detectives present, Rolle confirmed the following by responding "yes" or "no" to the ASA's questions. On January 1, 2013, Rolle and his friend Jemison were going shopping for shoes. He saw a car and could see Robinson in the front passenger seat, and the two plaintiffs, Hill and Jackson, in the back seat. During the videotaped interview, he identified each individual in a photo array, identified Robinson as the shooter, and identified Plaintiffs as passengers of the car that he saw just prior to the shooting. Rolle testified that while running away from the shooting, he glanced back to see Robinson shooting. Furthermore, Rolle acknowledged that he intended the markings on the photo arrays to identify

4

the three suspects as being involved in the shooting. Rolle told the ASA that the police treated him well during the interview process, confirmed that they had not made any threats or promises, and confirmed he was making his statements freely and voluntarily.

Antwoine Hill was arrested on February 23, 2013, and the detectives sought and obtained felony charges for first degree murder against Hill. On February 24, 2013, the detectives conducted yet another photo line-up. Rolle signed the spread advisory form and again identified Hill as one of the individuals in the car on the day of the shooting.

## III. Other Evidence

The detectives point to corroborating evidence to bolster their argument that they had probable cause to arrest Hill and Jackson. Plaintiffs point to evidence that contradicted the story that Rolle told at the time he told it.

After arresting Plaintiff Jackson, the detectives conducted a polygraph exam with Jackson, and he showed deception on the test when he denied knowledge or involvement in the homicide. Jackson also offered an alibi for the day of the shooting. When Detective Murphy contacted both alibi witnesses, they could not corroborate the story. In his interrogation with police officers, Jackson admitted to knowing the victim, said that the victim had beat him up previously, and that Jackson had been shot by members of the victim's gang. Detectives suggest that this evidence gave them further proof that Rolle's account was credible.

Plaintiffs point to the surveillance video to argue that the detectives unreasonably relied on the version of the story that Rolle first provided to them. The video shows Rolle and Jamison running down a parking area away from the shooter and then shows the shooter running back to a car, but the video does not show anybody standing by the car as a lookout. Rolle's account of the events placed Hill and Jackson by the car as lookouts. Defendants explain this discrepancy by

5

noting that the video analyst Hall told the detectives that the video was motion activated and thus might not capture continuous footage of a particular event. Plaintiffs also point out that other eyewitnesses interviewed by the detectives did not identify Plaintiff Jackson.

## IV. The December 2014 Trial

At criminal trial in December 2014, Robinson, Hill, and Jackson were tried for first degree murder in Illinois state court. Anthony Robinson, "B-A," was convicted of murder, and Hill and Jackson were found not guilty. When Rolle took the stand at the trial, his testimony differed from the information he had previously provided the detectives. He testified that he never looked back at who was shooting towards him on January 1, 2013. He testified that when he pointed out individuals on the photo array, he was pointing out people that he knew rather than pointing out people who he had seen on January 1. He testified that he did not read the spread advisory form before signing it. He confirmed that he had identified "B-A" as the shooter and that he had identified Plaintiffs as lookouts. Furthermore, Rolle testified that when he was being interviewed by the ASA, the detectives said that "they were going to say what happened" and Rolle was "just supposed to say yes or no." Rolle said he was willing to do whatever they wanted so that he would not get locked up on a warrant, and the police said that "if [Rolle] did what they wanted [Rolle] to do, they would not deal with that warrant at that time." When asked if the detectives had told him what to say, Rolle said "you could say that, yes." Later in the same testimony, Rolle said he did not go along with the detectives to get out of the warrant, but in fact the detectives said, "it wasn't they business about my warrant," and Rolle just wanted to "hurry up and get it over with."

Rolle testified that he did not refute the detectives' version of events because he "couldn't speak" and was "too nervous." He said that before his meeting with the ASA the detectives did

not tell him exactly what to say, but that they told him to say yes or no to the questions the lady asked. Rolle also testified that he was lying to the ASA to get out of there quickly.

## V.       Rolle's Deposition

In his deposition in the present case, Rolle says that his identifications of Jackson and Hill were not accurate. He said that he did not give accurate testimony because he was "nervous and afraid," and he had identified the suspects because he had just "got into it" with them. He further testified that when he identified the three individuals in the photo arrays, nobody told him who to identify. He stated that he was not worried about being arrested on his outstanding warrant when he first spoke with the police. Rolle also said that it was he, not the detectives, who first said that Plaintiffs were involved in the shooting.

Plaintiffs Hill and Jackson now bring a case against the detectives and the City of Chicago, arguing that the investigation, the arrest, and the prosecution violated various constitutional rights. Defendants move for summary judgment, arguing that the detectives' actions were supported by probable cause.

## LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then

shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers*, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

## DISCUSSION

### I. Discovery Issues

Before getting to the merits of Defendants' motion, it is necessary to address Plaintiffs' contention that it is not appropriate for this Court to consider the Affidavit of Defendant Roger Murphy, submitted with Defendant's Motion for Summary Judgment. In their Response to Defendants' Rule 56.1 Statement of Facts, Plaintiffs contend that a notary's placement of an "acknowledgment" on a statement does not make it a sworn statement or an "affidavit" proper for consideration alongside a motion for summary judgment.

Fed. R. Civ. P. 56(c)(4) permits the submission of an affidavit or declaration in support of a motion so long as it is (1) made on personal knowledge, (2) it sets out facts that would be

8

admissible in evidence, and (3) shows that the affiant or declarant is competent to testify on the matters stated. *See* Fed. R. Civ. P. 56(c)(4). Plaintiffs have not challenged whether Roger Murphy would be competent to testify at trial nor have they challenged the admissibility of Murphy's testimony. There was initially some confusion over whether the Affidavit of Roger Murphy was based on his personal knowledge, as the affidavit as originally submitted was signed by the other detective Defendant in this case, Thomas Carr. But after a hearing on the issue, the Court granted Defendants' Motion to Amend the Record and a version of the affidavit with Murphy's signature is now properly considered as part of the undisputed facts before the Court. No further hearings about the affidavit issue are necessary, and the parties' dispute over whether Plaintiffs may contact any notary who assisted in preparing the affidavit is now moot. The Court accepts Murphy's submitted testimony as part of the record when ruling on this summary judgment motion.

**II. Probable Cause**

Plaintiffs bring claims against the officers and the City under § 1983 for false arrest (Count II), unlawful search pursuant to that arrest (Count III), failure to intervene to prevent those constitutional deprivations (Count IV), and conspiracy (Count V). They also bring a claim against the officers and the City under state law for malicious prosecution (Count VII). The existence of probable cause is a defense to all these claims. Probable cause is "an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Furthermore, the detectives' search of Plaintiffs would be lawful if the detectives had probable cause to make the initial arrest. *See United States v. Garcia*, 605 F.2d 349, 352 (7th Cir. 1979) ("[I]t is well-settled that a warrantless search conducted incident to a lawful arrest is a

9

traditional exception to the warrant requirement of the Fourth Amendment."). Similarly, if the detectives did not violate the plaintiffs' rights with a wrongful arrest or illegal search, there can be no conspiracy claim or failure to intervene claim against the detectives or the City. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation."). As for Plaintiffs' state law claim, one of the elements for malicious prosecution under Illinois law is the lack of probable cause. *McDade v. Stacker*, 106 F. App'x 471, 475 (7th Cir. 2004). Thus a finding of probable cause similarly forecloses recovery for malicious prosecution. Plaintiffs' case turns almost entirely on whether or not the detectives had probable cause to arrest Clyde Jackson and Antwoine Hill in February 2013.

Police officers have probable cause to arrest an individual when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). The Court evaluates probable cause "not on the facts as an omniscient observer would perceive them," but rather "as they would have appeared to a reasonable person in the position of the arresting officer." *Id.*; *see also Mustafa*, 442 F.3d at 547. The testimony of a single witness can provide the police the trustworthy information necessary for a finding of probable cause to arrest. *Mustafa*, 442 F.3d at 548 ("Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect.").

Here, it is undisputed that the police officers relied on the testimony of a witness, Dwayne Rolle, in obtaining probable cause to arrest Plaintiffs. Rolle said that Plaintiffs

participated in the January 1, 2013 murder as lookouts, and the detectives relied on that testimony when arresting Hill and Jackson. The disputed issue in this case is whether Rolle was a reasonably credible witness at the time of the detectives' investigation.

Plaintiffs attack Rolle's credibility with three arguments: (1) Rolle's story changed when he testified at Plaintiffs' trial, (2) additional evidence collected by the detectives contradicted Rolle's account, making it unreliable, and (3) the detectives allegedly provided Rolle with the answers to questions, prior to asking him questions. I find that there is no triable issue on any of these three arguments.

**A. Witness's State of Mind**

First, I address the fact that much of the story Rolle gave to the detectives in early 2013 changed when Rolle testified at Plaintiffs' trial. When Rolle took the stand over a year after the detectives' investigation, Rolle no longer identified Plaintiffs as suspects in the murder. Rather, Rolle said that he only marked an X over the pictures of Hill and Jackson as a way of identifying that he knew them. When asked about the fact that he signed a form acknowledging that the photo array involved identifying suspects, he said he did not read the form before signing it. Rolle also testified that when he reiterated his identifications of Plaintiffs during a follow-up interview with the ASA, he was rushing through his answers to hurry up and get out of the police station. Plaintiffs argue that Rolle's change in story casts doubt on the trustworthiness of both the identifications and Rolle's interview.

For purposes of considering probable cause, it is significant that Rolle did not reveal his confusion about the photo arrays until he was testifying at the trial. For his mental state to make a difference in considering whether the detectives had probable cause, Rolle would have had to reveal it to the detectives during the investigation. He did not. Nothing in the record suggests

11

Rolle communicated to the detectives that he was not reading the acknowledgment form before signing it or was hurrying through the ASA questions without answering them truthfully. The record might support a conclusion that Rolle was indeed nervous or confused during the investigation, but there is no evidence from which a jury can conclude that a reasonable officer in the position of the detectives would have known about this mental state. Police "are entitled to act on the basis of observable events and let courts resolve conflicts about mental states." *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). Thus the police officers' decision to rely on Rolle's identifications and the content of Rolle's interview with the ASA was reasonable, even considering Rolle's subsequent revelations about his mental state at the time of the investigation.

## B. Contradicting Evidence

A second argument Plaintiffs put forward is that additional evidence gave the detectives reason to question Rolle's account of events, casting doubt on his reliability. They point to the video evidence of the shooting. Rolle said that Plaintiffs acted as lookouts and said they were standing by the shooter's vehicle. But the video that the detectives uncovered from the scene of the crime did not show any individuals standing by the shooter's vehicle.

The detectives can explain why they reasonably continued to rely on Rolle's testimony even though the video did not support it. The video footage did not capture the entirety of the January 1 incident. Rather, the video was motion activated and only began recording once the shooter had begun chasing the victims. While it is true that the video footage did not *corroborate* Rolle's account, the video footage does not contradict Rolle's account of events. Rolle said that he saw Plaintiffs in the car driven by Robinson in the moments before the shooting. The video did not record these moments. The question raised by the video is whether a reasonable officer in the position of the detectives could rely on Rolle's account of what he saw in the car prior to the

12

shooting, even if his account was not confirmed by partial video evidence. I find that the detectives could continue to rely on Rolle's report, even without support from the video. A witness's report need not be "unfailingly consistent to provide probable cause." *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999), as amended (Jan. 7, 2000). Rather, the credibility of a witness is not a question for "police officers in the discharge of their considerable duties, but for the jury in a criminal trial." *Id.* Thus even with the questions raised by partial video evidence, the police could reasonably rely on the testimony provided by Dwayne Rolle.

Plaintiffs also allege that the detectives should have insisted on obtaining additional video evidence from the Chicago Housing Authority. But the record shows that the detectives did what a reasonable detective would do in this situation. They contacted the security office and asked for all surveillance footage relevant to the shooting incident. Given the footage available to the detectives after such an inquiry, the detectives could reasonably rely on Rolle's account of events, even without video support. While it may be the case that the lack of corroborating video evidence is what exonerated Plaintiffs at trial, the standard for probable cause is much lower than the burden the state carried to prove its case in a criminal trial.

Plaintiffs also argue that the recovery of the murder weapon six months after the shooting obligated Defendants to renew their investigation. But this evidence was not available at the time of the alleged constitutional violations, when the detectives arrested Hill and Jackson. Evidence uncovered after the arrest is irrelevant to the central issue – whether probable cause existed at the time the allegedly unconstitutional decision was made. *See Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007).

**C. Witness Coaching**

Plaintiffs also argue that there is a triable issue as to whether the detectives coerced Rolle

13

into making identifications and influenced the manner in which he answered the ASA's questions. This argument hangs on a single exchange at Plaintiffs' criminal trial:

> Q: In fact, it was the officers, the detectives, Detective Murphy when he showed you these picture, he told you what he wanted you to identify them as doing; isn't that correct?
>
> A: You can say it something like that. They won't even let me talk.
>
> Q: They told you what they wanted you to say, right?
>
> A: Yes.
>
> Q: Is that true?
>
> A: You could say that, yes.
>
> Q: Well, I can say that because it is true, right?
>
> A: Yes, sir.

This testimony suggests that Rolle was fed answers prior to participating in the initial suspect identifications. If indeed the detectives provided answers to Rolle, then the detectives' subsequent reliance on those initial identifications would be unreasonable. But later at the same trial, Rolle testified that after those initial identifications, the detectives did not provide him with any answers:

> Q: Did they tell you what they wanted you to say and what roles they wanted you to assign to these people before the state's attorney came for the video?
>
> A: They ain't tell me exactly what to say. They just told me to say yes or no to the questions that the lady was asking me at that moment.

Rolle went on to say in his trial testimony that he was lying during his discussion on the video with the state's attorney because he was concerned with "getting up out of there."

It is clear from the record that the detectives elicited testimony from Rolle by asking questions, followed by either a "yes" or a "no" from Rolle. This method of interrogation alone

14

would not make Rolle's testimony unreliable. Only if the detectives specifically directed him which answer to provide to which question would they have improperly coached the witness. The only reasonable inference to draw from the trial testimony is that the police may have provided an answer during the initial witness identifications, but there is no evidence that the detectives provided any additional answers before Rolle's recorded session with the ASA. During that recorded session, Rolle answered the ASA's questions with a "yes" or "no" without any guidance about how to respond.

Defendants took the opportunity during Rolle's deposition to clarify what took place between Rolle and the detectives. When asked why he identified Plaintiffs as participants in the murder, Rolle said, "Like the only reason why I said it to [the detectives] because … we just got into it with [the Plaintiffs]." He had an altercation "over females" with Plaintiffs. He clearly stated that he was not worried about his warrant during his discussion with the detectives. When asked who first identified Plaintiffs as being involved in the shooting, Rolle said "That was me." Rolle said that the detectives "just asked me questions, who did this, who did that?"

I find that no reasonable jury could disregard Rolle's clear deposition testimony in favor of a single vague response from the criminal trial record. It would be unreasonable to infer from a single response about one particular aspect of the detectives' investigation that the entire investigation was a sham. There is nothing for a jury to do "where the factual record *taken as a whole* could not lead a rational trier of fact to find for the non-moving party." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (emphasis added). Rolle's ambiguous testimony at trial must be considered in context with the rest of his statements in the record. The record contains a detailed personal account of the night of the murder provided by Rolle to the ASA, a consistent pattern of identifying Plaintiffs as participants in the murder, and a clear

15

explanation provided during his deposition about his motivations for being untruthful during the investigation. What the record does not contain is a reasonably specific account of an instance when the detectives provided Rolle with an answer to a specific question. Thus Rolle's participation in the investigation provided the detectives with reliable information, and the detectives were reasonable to rely on that information.

Because the detectives had testimony from a credible and reliable witness that incriminated Plaintiffs, the detectives had probable cause to arrest Plaintiffs. Plaintiffs are therefore barred from recovering against either the detectives or the City for false arrest (Count II), unlawful search (Count III), failure to intervene (Count IV), conspiracy (Count V), or malicious prosecution (Count VII).

Given my conclusion that no reasonable jury could find that the detectives or the City violated Plaintiffs' constitutional rights, the Court need not consider the issue of qualified immunity.

### III. Due Process

Plaintiffs also allege that the proceedings against them violated their due process rights (Count I). The Seventh Circuit has held that a plaintiff cannot combine a false arrest claim under the Fourth Amendment and a state law malicious prosecution to create a "hybrid substantive due process claim under the Fourteenth Amendment." *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009). That is exactly what Plaintiffs have tried to do here. Plaintiffs' due process claim is barred as a matter of law.

### IV. Policy Claim

Finally, Plaintiffs' original complaint included allegations that the City of Chicago had a policy and practice of failing to investigate and suppress police misconduct. These allegations

against the City were dismissed, and Plaintiffs filed a Second Amended Complaint with an amended policy claim against the City (Count VI). Neither party acknowledged this outstanding claim in the briefing on summary judgment, and I decline to address it here.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted as to Counts I, II, III, IV, V, and VII in Plaintiffs' Second Amended Complaint. The sole remaining claim in the case is the policy claim (Count VI) against the City, which was unaddressed in the briefing on this motion.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: November 21, 2016